UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ELEANOR MOCKABEE, | : | Case No. 3:11-cv-343 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| MICHAEL J. ASTRUE | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED;
AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to a period of disability, disability insurance benefits, and

supplemental security income.[1] (*See* Administrative Transcript ("Tr.") (Tr. 8, 18)

(ALJ's decision)).

## I. OVERVIEW

On November 27, 2007, Plaintiff filed applications for a period of disability,

disability insurance benefits, and supplemental security income, alleging disability

commencing February 2, 2007. (Tr. 93, 103). Plaintiff alleged disability due to

---

[1] Although Plaintiff filed for supplemental security income (Tr. 8, 103-05), the ALJ's
decision only covers her claim for disability insurance benefits. (Tr. 8, 52-61).

fibromyalgia, osteoarthritis, osteoporosis, morbid obesity, and borderline intellectual functioning capacity.  (Tr. 8, 11).  The relevant time frame for purposes of this appeal is February 2, 2007 to July 1, 2010.  (Tr. 18).

Plaintiff's application was denied initially and upon reconsideration.  Plaintiff then appeared before an ALJ and testified at a hearing held on June 8, 2010.  (Tr. 8).  By decision dated July 1, 2010, the ALJ denied Plaintiff's claim for benefits.  (Tr. 8-18).  The ALJ found that Plaintiff retained the residual functional capacity ("RFC")[2] to perform work at the medium exertion level,[3] subject to additional limitations, and that she was capable of performing her past relevant work as a hand packager.  (Tr. 13-18).  Plaintiff filed for review of the ALJ's decision; however, the Appeals Council denied review, making the ALJ's findings the final decision of the Commissioner.  (Tr. 1-3).  Plaintiff then commenced this action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

Plaintiff was born on October 31, 1965, and is presently 47 years old.  (Tr. 103).  Plaintiff completed the tenth grade, attending special education classes during that time.  (Tr. 124).  Plaintiff performed past relevant work as a hand packager from 1987 to 1997.  (Tr. 17).

---

[2]  A residual functional capacity is the most you can still do despite your limitations.  It is assessed based on the relevant evidence in your case record.  20 C.F.R. § 404.1545.

[3]  Work classifications are defined for Social Security purposes based on the amount of physical exertion involved.  Medium work involves lifting no more than 50 pounds occasionally and 25 pounds frequently.  It also involves walking or standing for as much as six hours during any given eight-hour work day, frequent bending or stooping, and the use of upper extremities for grasping, holding, and turning objects.  20 C.F.R. §§ 404.1567(a).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.

2.  The claimant has not engaged in substantial gainful activity since February 2, 2007, the alleged onset date (20 CFR 404.150(b) and 404.1571 *et seq.*).

3.  The claimant has the following impairments which are severe for Social Security purposes: mild generalized osteoarthritis; mild osteoporosis; fibromyalgia; morbid obesity; and borderline intellectual functioning (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant lacks the residual functional capacity to: (1) lift more than 25 pounds frequently and 50 pounds occasionally; (2) perform more than occasional crawling, crouching, stooping, kneeling, and stair climbing; (3) climb ladders or scaffolds or perform any job requiring a good ability to balance; (4) work at temperature extremes or in a wet or humid area; (5) follow complex or detailed instructions; or (5) do a job requiring reading skills above a tenth-grade level or math skills above a fourth-grade level.

6.  The claimant is capable of performing past relevant work as a hand packager.

7.  The claimant has not been under disability, as defined in the Social Security Act, from February 2, 2007, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 10-18).

In sum, the ALJ concluded that, based on the application for a period of disability and disability insurance benefits filed on November 27, 2007, Plaintiff is not disabled under sections 216(i) and 223(d) of the Social Security Act, and, therefore, not eligible for such benefits.  (Tr. 18).

On appeal, Plaintiff argues that: (1) the ALJ erred in his assessment of the opinion of Plaintiff's treating physician in violation of 20 C.F.R. 404.27(d) and SSR 96-2p and by failing to properly evaluate and consider Plaintiff's fibromyalgia in accordance with SSR 99-02p; (2) the ALJ erred by giving inadequate consideration to the Plaintiff's credibility even though her testimony was supported by medical records; and (3) the ALJ erred by relying on an improper hypothetical to the vocational expert which does not constitute substantial evidence of the Plaintiff's vocational abilities.  The Court will address each argument in turn.

## II.  ANALYSIS

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this review, the Court considers the record as a whole.  *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon

which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## A. The Medical Evidence

The record reflects that:

In March and April 2007, Plaintiff underwent surgery on both feet to remedy the occurrence of plantar fasciitis, resulting in the release of tension in the plantar fascia ligament and an excision of a portion of the spur. (Tr. 198, 200).

In an office note dated June 16, 2007, Plaintiff's primary care physician, Bernard Berks, D.O., reported that Plaintiff was 62 inches [5 feet 2 inches] and weighed 204 pounds. (Tr. 255). Dr. Berks further noted that Plaintiff's musculoskeletal examination was abnormal, and that Plaintiff complained of joint pain in her knees and ankles. (*Id.*)

–5–

This report was reiterated at Plaintiff's next appointment with Dr. Berks on July 10, 2007. (Tr. 253).  During that visit, Dr. Berks indicated that Plaintiff continued to have pain in her feet and legs, and that she had ceased working due to that pain.  (*Id.*)

At the follow-up visit on July 18, 2007, Dr. Berks reported that Plaintiff's swelling had gone down and that she was feeling better.  (Tr. 253).  However, he noted that Plaintiff had not worked since February of that year and was unable to stand for more than two to three hours.  (*Id.*)

Following the July 18th visit with Dr. Berks, Plaintiff submitted to a Venous Duplex Scan on July 20, 2007.[4]  That scan showed a lack of compressibility, increased dilation, and questionable echodensity of the left popliteal vein leading to a high suspicion of acute deep-vein thrombosis of that vein.[5]  (Tr. 217).  Of passing note, the record indicates suspicions of acute DVT as to the right vein; however the scanning and imagining findings discuss left vein thrombosis.  (*Id.*)  During the July 20th visit, a

---

[4] A Venous Duplex Scan is the use of ultrasound to capture images of internal views of veins that return blood to the heart.  MemorialCare Health System, http://www.memorialcare.org/medical_services/heart-care/venous-duplex.cfm (last visited Nov. 16, 2012).

[5] The popliteal vein is the vein located behind the knee.  Princeton University WordNet Search, http://wordnet.princeton.edu/perl/webwn?s=popliteal%20vein (Last visited Nov. 16, 2012).  Deep Vein Thrombosis ("DVT") is a condition in which a blood clot (thrombus) forms in one or more of the deep veins in your body. This commonly occurs in your legs and can cause leg pain, but occurs without any other symptoms.  The Mayo Clinic, Diseases and Conditions Search, http://www.mayoclinic.com/health/deep-vein-thrombosis/DS01005 (last visited Nov. 16, 2012).

peripheral arterial report concluded that Plaintiff had no high grade stenosis greater than 50% bilaterally.[6] (Tr. 218).

On July 25, 2007, Plaintiff saw Stephen Greer, D.O., for an evaluation of leg weakness and numbness. (Tr. 223). Dr. Greer noted that some edema was present in Plaintiff's legs, left leg greater than right; although, the ailment was improved with diuretics.[7] (*Id*.) In interpreting the Venous Duplex Scan of July 20th, Dr. Greer noted that the non-invasive testing showed venous disease with probable deep vein thrombosis in the left popliteal area. (*Id*.) However, following this appointment, Dr. Greer ordered a lumbar CT scan and a repeat of the Venous Duplex Scan. (Tr. 225). The second Venous Duplex Scan concluded that there was no evidence of DVT in either the left or right leg. (Tr. 221-222). The lumbar CT scan showed back and disc defects but no sign of spinal stenosis. (Tr. 219). Dr. Greer prescribed graduated compression hose and referred her back to Dr. Berks' care. (*Id.*)

During August 2007, Plaintiff received a bone density and vertebral assessment, and a whole body bone scan. The assessment considered Plaintiff's spine to be osteoporotic, whereas her hip, despite decreased bone density, was within normal limits.

---

[6] High grade stenosis is an abnormal narrowing or contraction of a duct or canal, sometimes called a stricture. The Free Medical Dictionary, http://medical-dictionary.thefreedictionary.com/stenosis (last visited Nov. 16, 2012).

[7] Diuretics are drugs which help reduce the amount of water in the body. The Free Medical Dictionary, http://medical-dictionary.thefreedictionary.com/Diuretics (last visited Nov. 16, 2012).

(Tr. 291).  The whole body bone scan showed degenerative changes to the ankles, shoulders, and knees.  (Tr. 240).

On September 4, 2007, Plaintiff saw rheumatologist Thomas Henderson, M.D., for an initial evaluation.  (Tr. 326).  Dr. Henderson reported that Plaintiff experienced insomnia and the presentation of basically all joints with diffuse tender points. (*Id*.)  To this point, Dr. Henderson noted that Plaintiff had been unable to work since February 2007, when she had been working as a nurse's aide in a nursing home.  (*Id*.)  At this time, Dr. Henderson recorded Plaintiff as 63 inches tall [5 feet 3 inches], weighing 197 pounds, with eleven out of a possible eighteen diffuse tender points on her extremities.[8]  (*Id*.)  Dr. Henderson also noted tenderness of the metatarsophalangeal joints bilaterally.[9] (*Id*.)  In consideration of the preceding notes, Dr. Henderson diagnosed Plaintiff as suffering from

---

[8]    Tender points are used in diagnosing fibromyalgia.  They are specific places on the body that are painful when a standard amount of pressure (about 4kg) is applied, but do not refer pain to elsewhere in the body.  The American College of Rheumatology requires pain in at least eleven out of a possible eighteen tender points for a diagnosis of Fibromyalgia (i.e., 11/18). The eighteen sites are consistently present in patients with fibromyalgia and are used for diagnosis. About.com Health page, Fibromyalgia & Chronic Fatigue, http://chronicfatigue.about.com/od/fmsglossary/g/tenderpoints.htm (last visited Nov. 17, 2012).

[9]    The metatarsophalangeal joints are those joints between the metatarsal bones of the foot and the proximal phalanges of the toes.  The Free Medical Dictionary, http://medical-dictionary.thefreedictionary.com/metatarsophalangeal+joint (last visited Nov. 16, 2012).

fibromyalgia[10] and polyarthritis[11] of undetermined etiology, with a history of plantar fasciitis.[12]  (*Id.*)

At follow-up appointments on October 1, 2007 and November 1, 2007, Dr. Henderson reiterated that Plaintiff was seen again for fibromyalgia and polyarthritis.  (Tr. 324).  At both appointments, Dr. Henderson reported that his examination findings were unchanged from his previous impressions.  Furthermore, during the first visit, Dr. Henderson increased Plaintiff's medication regimen; he prescribed Zanaflex 4 mg at night, up from 2 mg, and Tramadol 50 mg, increased from three times per day to four times per day as needed for pain.  (*Id.*)  During the second visit, Dr. Henderson reported that Plaintiff had recovered well from her plantar fasciitis surgeries from the spring of 2007, but was still having a lot of difficulty with lifting and with standing for up to an hour.  (Tr. 324).  At this point, Dr. Henderson spoke to Plaintiff and her husband about disability and urged her to pursue Social Security Disability.  (*Id.*)

---

[10]  Fibromyalgia is a syndrome in which a person has long-term, body-wide pain and tenderness in the joints, muscles, tendons and other soft tissues.  The U.S. Nat'l Library of Medicine,  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001463/ (last visited Nov. 16, 2012).

[11] Polyarthritis is the simultaneous inflammation of several joints.  The Free Medical Dictionary, http://medical-dictionary.thefreedictionary.com/polyarthritis (last visited Nov. 16, 2012).

[12] Plantar fasciitis is the inflammation of the thick tissue on the bottom of the foot.  It is the tissue that connects the heel bone to the toes and creates the arch of the foot.  MedlinePlus, a service of the U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/ency/article/007021.htm (last visited Nov. 17, 2012).

On January 9, 2008, Dr. Henderson reported that he saw Plaintiff to complete disability forms. (Tr. 323). At that visit, Dr. Henderson noted that Plaintiff continued to have diffuse tender points, and that they have persisted for at least three years as relating to her musculoskeletal problems. (*Id.*) He reaffirmed his diagnosis of fibromyalgia and osteoarthritis. (*Id.*) During that same visit, Dr. Henderson completed a disability request from the state agency. (Tr. 321-322). In that form, Dr. Henderson noted that Plaintiff had diffuse musculoskeletal pain for three years, that the intensity/persistence of symptoms and/or pain was something he customarily saw in association with the degree of physical findings described, and that Plaintiff had difficulty with heavy lifting. (*Id.*) Dr. Henderson also noted that Plaintiff had muscle spasms of the back and legs, problems with her right hip, some right sided radicular pain, and that her gait was unsteady. (*Id.*)

In between visits to Dr. Henderson, Plaintiff was seen by Dr. Berks on March 7, 2008. At that examination, Dr. Berks reported that Plaintiff's musculoskeletal and GI examinations were abnormal. (Tr. 422). Dr. Berks also reported that Plaintiff complained of occasional discomfort of her right shoulder. (*Id.*) Dr. Berks recorded the same findings at Plaintiff's next appointment in May 2008. (Tr. 419).

Also during March 2008, state agency physician Dr. Drew reviewed the evidence in the record. (Tr. 364). Dr. Drew concluded that Plaintiff retained the ability to lift and/or carry twenty-five pounds frequently and fifty pounds occasionally, sit and stand each for about six hours in an eight-hour work day, and engage in occasional postural

activities, with the exception of climbing ladders, ropes, or scaffolds, which she should never do.  (Tr. 358-359).  Dr. Drew further limited Plaintiff to occasional balancing due to her unsteady gait.  (Tr. 359).  Dr. Drew's opinion on this evidence was affirmed by state agency physician Dr. Hall in August 2008.  (Tr. 371).

In office notes dated April 9, 2008 and June 9, 2008, Dr. Henderson reported that Plaintiff still had diffuse tender points, some low back tenderness, and clinical evidence of osteoarthritis, particularly in the peripheral joints.  (Tr. 367, 368).

During the June 9th appointment, Dr. Henderson completed another disability form at the request of the state agency.  (Tr. 369-370).  In that form, Dr. Henderson indicated that Plaintiff had diffuse musculoskeletal pain for the past four years with severe pain in multiple areas, that the intensity and persistence of Plaintiff's symptoms was something he customarily saw in association with the degree of physical findings he described, that Plaintiff had muscle spasms of the back, legs, and hips as well as right-sided radicular pain,[13] that Plaintiff had difficulty with heavy lifting, and that Plaintiff's gait was unsteady but did not require an ambulatory aid.  (Tr. 370).

Plaintiff continued to present with diffuse tender points upon physical examination in September.  (Tr. 406).  On September 23, 2008, Plaintiff's representative asked Dr. Henderson to complete an Arthritis Residual Functional Capacity questionnaire.  (Tr.

---

[13] Radicular pain is pain that radiates into the lower extremity along the course of the spinal nerve root due to inflammation or irritation.  Spine-Health web page, http://www.spine-health.com/glossary/r/radicular-pain-and-radiculopathy (last visited Nov. 16, 2012).

373-376). In that questionnaire, Dr. Henderson stated that Plaintiff had fibromyalgia and osteoarthritis, joint deformity, reduced grip strength, impaired sleep, tenderness, trigger points, and muscle spasms. (Tr. 373). Dr. Henderson also stated that Plaintiff was not a malingerer and that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations. (*Id*.)

In the questionnaire, Dr. Henderson also evaluated the Plaintiff's ability to sit and stand during an eight-hour work day. He concluded that Plaintiff could sit for less than two hours total in an eight-hour work day and that she could stand/walk for less than two hours total in an eight-hour work day. (Tr. 374). Furthermore, Dr. Henderson opined that Plaintiff could walk less than one block without experiencing severe pain or needing to rest, that she could only sit for thirty minutes at a time, and that she could only stand for fifteen minutes at a time. (Tr. 375). As a result, Plaintiff needed to walk around for two minutes every half hour and take an unscheduled five-minute break every two hours. (Tr. 374). Dr. Henderson also stated that Plaintiff could only occasionally lift less than ten pounds and could rarely lift ten pounds. (*Id*.)

Additionally, according to Dr. Henderson, Plaintiff's experience of pain or other symptoms would occasionally be severe enough to interfere with her attention and concentration needed to perform even simple work tasks during a typical work day. (Tr. 375). Accordingly, Dr. Henderson concluded that Plaintiff's impairments were likely to

-12-

produce "good days" and "bad days," and would result in Plaintiff missing more than four days of work per month due to these impairments or her treatments. (Tr. 376).

During the September 23, 2008 office visit, Dr. Henderson noted that Plaintiff had decreased range of motion of her right shoulder, and that an x-ray of the right shoulder revealed osteoarthritis, leading to a diagnosis of Rotator Cuff Tendonitis. (Tr. 403-404).

Plaintiff next saw Dr. Henderson on November 17, 2008. At that appointment, Dr. Henderson noted that Plaintiff's weight continued to be 203 pounds and that she continued to suffer from significant tender points and insomnia. (Tr. 404). Nine days after that appointment, Dr. Henderson's office noted that Plaintiff's prescription for Cymbalta was non-formulary,[14] and that Plaintiff should finish her current allotment and then increase the dosage of Zanaflex in lieu of the Cymbalta. (*Id.*)

At a follow-up appointment on November 29, 2008, Dr. Berks reported that his musculoskeletal examination of Plaintiff was abnormal. (Tr. 418). Dr. Berks reiterated this observation at Plaintiff's February 28, 2009 visit as well. (Tr. 413). At Plaintiff's May 28, 2009 appointment with Dr. Berks, both her musculoskeletal and endocrine exams were abnormal. (Tr. 410).

On March 11, 2009, Dr. Henderson reported his physical examination showed eleven out of a possible eighteen tender points. (Tr. 401). By a June 11, 2009

---

[14] Non-formulary drugs are drugs that are not approved by a health care plan. United Medicare, Glossary page, https://www.unitedmedicarerx.com/glossary.html (last visited Nov. 16, 2012).

appointment, Dr. Henderson noted his physical exam showed eight of eighteen tender points and he increased Plaintiff's Cymbalta regimen to 60 mg a day instead of 30 mg a day.  (*Id*.)

Upon Plaintiff's appointment with Dr. Henderson on September 17, 2009, he noted continual diffuse pain in Plaintiff's muscles and joints, increased fatigue, and difficulty sleeping.  (Tr. 436).  Plaintiff explained that she was trying to exercise, but her hip hurt.  (*Id*.)  Plaintiff also reported that she was not getting enough relief at nighttime from her Zanaflex regimen.  (*Id*.)  In response, Dr. Henderson increased Plaintiff's Zanaflex medication.  (*Id*.)  Also, Plaintiff's physical examination showed multiple diffuse tender points, especially on the proximal arms and legs.  (*Id*.)  At Plaintiff's three month follow-up on December 17, 2009, Dr. Henderson again reported diffuse tender points secondary to fibromyalgia on physical examination.  (Tr. 453).  Dr. Henderson refilled Plaintiffs prescriptions of Zanaflex, Cymbalta, Tramadol, and Naprosyn, and scheduled a follow-up appointment three months later.  (*Id*.)

On March 18, 2010, Dr. Henderson reported that Plaintiff was clinically stable with no new lesions.  (Tr. 453).  Dr. Henderson noted that she had been doing well on her current medication regimen and that she was to continue that program and come back in three months.  (*Id*.)

Plaintiff saw her primary care physician, Dr. Berks, on April 26, 2010. At that examination, Dr. Berks reported that Plaintiff's body mass index was 37.7.[15] (Tr. 440). He also noted that Plaintiff's ears, nose, throat, lungs, and GI examinations were abnormal. (*Id*.)

On May 27, 2010, at the request of Plaintiff's counsel, Dr. Henderson completed an Arthritis Residual Functional Capacity questionnaire. (Tr. 448-451). In that questionnaire, Dr. Henderson identified the presence of trigger points and swelling of Plaintiff's feet and legs as positive objective signs of Plaintiff's disabilities and indicated that the Plaintiff was not a malingerer. (Tr. 448). Dr. Henderson further reported that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in his evaluation, and that emotional factors contributed to the severity of those symptoms. (Tr. 448-449). Accordingly, Dr. Henderson stated that Plaintiff's experience of pain or other symptoms would occasionally be severe enough to interfere with her attention and concentration and would impede her ability to perform even simple work tasks during a typical work day. (Tr. 449).

---

[15] Body Mass Index is a measurement of the relative percentages of fat and muscle mass in the human body, in which mass in kilograms is divided by height in meters squared and the result used as an index of obesity. Dictionary.com, http://dictionary.reference.com/browse/body+mass+index (last visited Nov. 16, 2012).
A Body Mass Index from 18.5 to 24.9 is considered normal weight; *a Body Mass Index of 30 or greater is considered obese*. National Heart Lung and Blood Institute, BMI page http://nhlbisupport.com/bmi/ (last visited Nov. 16, 2012).

-15-

Additionally, Dr. Henderson indicated that Plaintiff could walk less than one city block before needing to rest or experiencing severe pain, sit for fifteen minutes at one time, stand for ten minutes at a time, sit for less than two hours total in an eight hour work day, and could stand or walk less than two hours total in an eight hour work day. (Tr. 450). Considering Plaintiff's physical restrictions, Dr. Henderson opined that Plaintiff needed a job that would allow her to alternate at will between sitting, standing, or walking, and also allow her to take an unscheduled one to two minute break every one to two hours. (*Id.*) Also, Dr. Henderson stated that Plaintiff could only occasionally lift or carry objects weighing less than ten pounds and could only rarely lift or carry objects with a weight of ten pounds. (*Id.*) Dr. Henderson concluded the questionnaire by stating that Plaintiff's impairments would likely produce "good days" and "bad days," and that, as a result, he estimated Plaintiff would miss more than four days of work per month due to the symptoms of or treatments for these impairments. (Tr. 451).

During the May 27, 2010 appointment, Dr. Henderson also reported that he had reviewed Plaintiff's most recent DEXA scan from May 11, 2010.[16] Dr. Henderson interpreted this scan to show osteopenia of the AP spine. (Tr. 452). Furthermore, the DEXA scan indicated that Plaintiff's hip determinations were normal. (*Id.*) However,

---

[16] A DEXA scan is the acronym for a dual-energy x-ray absorptiometry scan. The scan is used to measure bone loss. RadiologyInfo, http://www.radiologyinfo.org/en/info.cfm?pg=dexa (last visited Nov. 16, 2012).

Dr. Henderson's physical examination of Plaintiff continued to yield diffuse tender points. (*Id*.)

### B. Plaintiff's First Assignment of Error

First, Plaintiff claims that the ALJ erred in his assessment of her treating physician's opinion, and specifically failed to consider that opinion in accordance with her fibromyalgia.[17]

In his opinion, the ALJ found that Plaintiff suffered from the severe impairments of: mild generalized osteoarthritis; mild osteoporosis; fibromyalgia; morbid obesity; and borderline intellectual functioning. (Tr. 11). To these points, the ALJ noted that the medical record and the notes of Doctors Henderson and Berks illustrate that Plaintiff was properly diagnosed with these various impairments. Bone scans, X-rays, and other tests support Plaintiff's impairments of osteoarthritis, osteoporosis, degenerative changes to joints, a history of osteopenia, and joint deformity. (Tr. 12). Furthermore, Dr. Henderson, a specialist in Rheumatology and Plaintiff's treating physician for two and a half years, diagnosed her with fibromyalgia following repeated presentation of musculoskeletal pain, diffuse tender points, complaints of increased fatigue, and joint pain in her shoulder, hips, knees, and feet. (Tr. 12). In consideration of these facts and opinions, the ALJ correctly determined that Plaintiff suffered from these severe impairments, including establishing a fibromyalgia diagnosis as provided in *Rogers v.*

---

[17] Plaintiff alleged disability based on several impairments; however, Plaintiff's Statement of Errors only presents the fibromyalgia claim for review.

*Comm'r of Soc. Sec.,* 486 F.3d 234, 244 (6th Cir. 2007). (*Id.*) (the process of diagnosing fibromyalgia includes: 1) the testing of a series of focal points for tenderness, and 2) the ruling out of other possible conditions through objective medical and clinical trials.)

In determining Plaintiff's limitations, the ALJ concluded that Plaintiff had not presented substantial evidence that would prevent her from performing the basic exertional requirements of medium work. (Tr. 15). By making this finding, the ALJ determined that Dr. Henderson's opinions could not be given controlling or deferential weight because his conclusions were neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with the other substantial evidence in the case record. (Tr. 16). Specifically, the ALJ noted that the record lacked signs, clinical findings, diagnostic tests, or laboratory findings which would have supported the limitations imposed by Dr. Henderson.[18] (*Id.*)

In fact, the ALJ determined that the record supported the following findings: Plaintiff's medical treatment was essentially routine and conservative in nature; Plaintiff's medications were providing her with good relief; and, Plaintiff was able to

---

[18]  Because fibromyalgia is a syndrome that is not evidenced by objectively alarming signs, a lack of diagnostic tests or affirmative clinical findings is expected when establishing a diagnosis. *See Rogers,* 486 F.3d at 243. Here, however, the ALJ's conclusion is that the extent of the resulting limitations described by Dr. Henderson are not supported by any objective factors (i.e., test results or affirmative clinical findings). That is, The ALJ's conclusion is not that the fibromyalgia is not supported by test results, etc.; it is the extent of the resulting limitations that are not supported by affirmative clinical findings. And, moreover, the ALJ does point to affirmative findings which contradict the extent of the limitations. *See* next paragraph, *infra.*

perform her own hygiene, cook, clean, drive, and shop.  (Tr. 16-17).  Plaintiff expressly

noted that when she was on her medications, her feelings of pain significantly decreased.

(Tr. 41).  Furthermore, both of Plaintiff's primary care physicians indicated that Plaintiff

was "feeling good," "doing well," and "clinically stable."  (Tr. 453, 410, 413, 419, 434,

437, 440-441, 444).

Because the treating sources' medical opinions were inconsistent with the other

substantial evidence in the case record, the ALJ properly determined that the opinions of

Dr. Berks and Dr. Henderson were not afforded controlling weight.  *Smith v. Comm'r of*

*Soc. Sec.,* 482 F.3d 873, 877 (6th Cir. 2007).  Furthermore, because the opinion of Dr.

Henderson was not well-explained or supported by evidence, as to the extent of

Plaintiff's limitations, his conclusions as to those limitations were properly weighed by

the ALJ in his consideration of Plaintiff's case.  *See* 20 C.F.R. § 404.1524(d).

### C.  Plaintiff's Second Assignment of Error

Second, Plaintiff claims that the ALJ gave inadequate consideration to Plaintiff's

credibility.  The Court accords the ALJ's credibility assessment with great deference.

*Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 476 (6th Cir. 2003).  This deference is

predicated on the ALJ's sole opportunity to observe a witness' demeanor while

testifying.  (*Id.*)  Further, the Court is bound to the restrictions of review and "may not

try the case *de novo*, not resolve conflicts in the evidence, not decide questions of

credibility."  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir. 1997).

The regulations set forth factors that the ALJ should consider in assessing credibility, including: the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment or measures, other than medication, taken to relieve pain.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi); 416.929(c)(3)(i)-(vi).

Plaintiff alleges that she could only walk for half of a block, stand for fifteen to twenty minutes, sit for thirty minutes, and lift ten pounds.  (Tr. 17).  However, to the extent that Plaintiff's pain necessitated these limitations, there is not sufficient evidence.  *Jones*, 336 F.3d 476 (6th Cir. 2003) (subjective complaints can support a claim for disability, if there is also objective medical evidence).  Here, the ALJ considered all of the medical evidence regarding Plaintiff's impairments.  And, if the claimed pain is not substantiated by the medical record, the ALJ must make a credibility determination based on the entire case record.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *Siterlet* v. *Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).

In addition to the objective medical evidence, the ALJ noted that Plaintiff's treating physician and rheumatologist stated that she was deriving benefit from her pain medication regimen and getting better with rest, a statement which the Plaintiff echoed

in her testimony.[19]  (Tr. 17).  Furthermore, the ALJ discussed Plaintiff's daily routine and her conservative treatment regimen as additional examples of inconsistencies between the objective record and Plaintiff's subjective statements of disability.  *See* SSR 96-7p ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the levels of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure").

Plaintiff also claimed the ALJ erred with respect to her credibility regarding her Borderline Intellectual Functioning.  The ALJ relied on the evidence in the record that Plaintiff reads, works crossword puzzles, passed a written driver's exam, and had prior vocational training at a semi-skilled job.  (Tr. 17).  Additionally, the ALJ noted that the state examining psychologist, Dr. Bonds, had stated that Plaintiff might have exaggerated her symptoms and limitations.[20]  (*Id.*)  Despite these entries in the record, the ALJ did consider Plaintiff's intellectual functioning in his consideration.  The

---

[19]  The ALJ may overstate the amount of pain relief that Plaintiff has derived from her prescription regimen.  However, despite the potential exaggeration, Plaintiff's treatment schedule does not meet the level of severe limitations described by Dr. Henderson, and it is readily distinguishable from the course of treatments and numerous prescriptions seen in *Rogers*, 486 F.3d at 244.

[20]  The Plaintiff did not intentionally exaggerate to manipulate her score on her IQ test. The report from Dr. Bonds and his colleague, Ms. Brewer, simply noted that Plaintiff answered the questions quickly and carelessly, did not react to success or failure, and did not initiate any conversation.  (Tr. 332).  Dr. Bonds' statement that Plaintiff's "scores *may* be an underestimate of the [Plaintiff's] abilities due to a lack of motivation and careless answering" is neither definitive nor entirely fair.  (*Id.*) (emphasis added).

ALJ's residual functional capacity decision thus properly included restrictions based on Plaintiff's inability to follow complex or detailed instructions or do a job requiring reading skills above a tenth-grade level or math skills above a fourth-grade level. (Tr. 14).

Therefore, the ALJ properly found that Plaintiff's allegations of disability were not supported by the objective medical record.

### D. Plaintiff's Third Assignment of Error

Finally, Plaintiff claims that the ALJ relied on an improper hypothetical that did not constitute substantial evidence of her vocational abilities. In formulating these hypotheticals, the ALJ shall include only those assumptions that are consistent with the objective record, and does not need to include any unsubstantiated complaints. *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).

In questioning the vocational expert, the ALJ crafted a profile based on the Plaintiff's age, education, and work history with the following limitations: crawling, crouching, stooping, kneeling, climbing of stairs limited to occasional; no climbing of ladders or scaffolds; no requirement to maintain good balance; no requirement of reading above an eighth grade level or math above a fourth grade level; and otherwise no complex or detailed instructions. (Tr. 48). After the baseline answer, the ALJ amended his hypothetical to include a restriction that would allow the candidate to alternate between sitting or standing positions at thirty minute intervals throughout the

day.  (*Id.*)  These hypotheticals represent the ALJ's consideration of all of the medical

evidence and the opinions of Dr. Henderson, Dr. Berks, and the state agency

physicians.

Because the ALJ properly determined that Dr. Henderson's opinions were not

entitled to deferential weight, the ALJ appropriately utilized the substantiated facts of

the record to construct a hypothetical worker profile for the vocational expert.  *See, e.g.,*

*Stanley v. Sec'y of Health & Human Servs.,* 39 F.3d 115 (6th Cir. 1994).

The Court's duty on appeal is not to re-weigh the evidence, but to determine

whether the decision below is supported by substantial evidence.  *Raisor* v. *Schweiker*,

540 F.Supp. 686 (S.D. Ohio 1982).  The Commissioner's decision in this case is

supported by such evidence.

## III.  CONCLUSION

For the foregoing reasons, Plaintiff's assignments of error are unavailing.  The

ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that

Eleanor J. Mockabee was not entitled to disability insurance benefits, is found

**SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further

matters remain pending for the Court's review, this case is **CLOSED.**


Date: November 26, 2012                          *s/ Timothy S. Black*
                                                      Timothy S. Black
                                                      United States District Judge

-23-